**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RICHARD DELANO CORNELL, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. _____ |
| v. | |
| MICHIGAN AVENUE IMMEDIATE CARE, S.C., | |
| Defendant. | **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Richard Delano Cornell ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against Michigan Avenue Immediate Care, S.C. ("MAIC" or "Defendant"), by and through his attorneys, and alleges, based upon personal knowledge as to his own actions and his counsels' investigation, and based upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1.      MAIC is a full-service, immediate care center located in Chicago, Illinois providing treatment and health services to patients with acute and non-urgent medical problems.[1]

2.      As an urgent care center providing a wide variety of medical services, MAIC collects, maintains, and stores its patients' highly sensitive personal and medical information including, but not limited to: Social Security numbers, dates of birth, full names, addresses,

---

[1] *About Our Urgent Care Clinic*, Michigan Avenue Immediate Care, https://www.michiganavenueprimarycare.com/immediate-about-us (last accessed July 18, 2022).

1

telephone numbers, driver's license numbers, information regarding medical treatment, diagnosis, and prescriptions, medical record numbers, health insurance information, and other protected health information ("personally identifying information" or "PII").[2]

3.      Although MAIC is a sophisticated medical entity providing services to hundreds of thousands of patients, MAIC failed to invest in adequate data security, thereby allowing hackers to exfiltrate the highly-sensitive personal and medical information of approximately 144,104 individuals, including the Plaintiff and Class members.[3] As a direct, proximate, and foreseeable result of MAIC's failure to implement reasonable security protections sufficient to prevent an eminently avoidable cyberattack, unauthorized actors compromised MAIC's network and accessed thousands of patient files containing highly-sensitive PII.[4]

4.      Specifically, sometime in or around November 2021, MAIC's patients' sensitive personal and medical data was compromised when unauthorized actors were able to breach MAIC's network and access files containing approximately 144,104 individual's PII (the "Data Breach").[5]

5.      Despite the fact that many of the categories of PII exposed in the Data Breach, such as Social Security numbers and medical information, cannot be changed, MAIC failed to detect

---

[2] *Data Breaches Reported by University Pediatric Dentistry, OrthoNebraska, Michigan Avenue Immediate Care*, HIPAA Journal, https://www.hipaajournal.com/data-breaches-reported-by-university-pediatric-dentistry-orthonebraska-michigan-avenue-immediate-care/ (last accessed July 20, 2022); *See Immediate Care Facility in Chicago Hacked in December. Do Patients Know? (UPDATE1)*, DateBreaches.net, https://www.databreaches.net/immediate-care-facility-in-chicago-hacked-in-december-do-patients-know/ (last accessed July 20, 2022); *See 1.9M Patients, 657 Providers Face Data Breach After Debt Collections Firm Attach*, SC Media, https://www.scmagazine.com/analysis/breach/1-9m-patients-657-providers-face-data-breach-after-debt-collections-firm-attack (last accessed July 20, 2022).
[3] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. Department of Health and Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed July 20, 2022); *See HIPAA Breach News*, HIPAA Clicks, https://hipaaclicks.com/category/hipaa-breach-news/ (last accessed July 20, 2022).
[4] *Id.*
[5] *Id.*

the breach until on or around May 2022—more than **six months** after unauthorized individuals accessed Plaintiff's and current and former patients' highly sensitive PII stored on MAIC's systems.

6.      MAIC's failure to promptly notify Plaintiff and Class members that their PII was exfiltrated due to MAIC's security failures virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse and/or disseminate that PII before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

7.      MAIC failed to take sufficient and reasonable measures to safeguard its data security systems and protect highly sensitive data in order to prevent the Data Breach from occurring; to disclose to current and former patients the material fact that it lacked appropriate data systems and security practices to secure PII and medical information; and to timely detect and provide adequate notice of the Data Breach to affected individuals. Due to MAIC's failures, Plaintiff and approximately 144,104 individuals suffered substantial harm and injury.

8.      As a result of MAIC's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiff's and Class members' PII was accessed and acquired by unauthorized third-parties for the express purpose of misusing the data and causing further irreparable harm to the personal, financial, reputational, and future well-being of MAIC's current and former patients. Plaintiff and Class members face the real, immediate, and likely danger of identity theft and misuse of their PII, especially because their PII was specifically targeted by malevolent actors.

9.     Plaintiff and Class members suffered injuries as a result of MAIC's conduct including, but not limited to: lost or diminished value of their PII; out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; time needed to change usernames and passwords on their accounts; time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach; charges and fees associated with fraudulent charges on their accounts; and the continued and increased risk of compromise to their PII, which remains in MAIC's possession and is subject to further unauthorized disclosures so long as MAIC fails to undertake appropriate and adequate measures to protect their PII. These risks will remain for the lifetimes of Plaintiff and the Class.

10.     Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief from MAIC's failure to reasonably safeguard Plaintiff's and Class members' PII; its failure to reasonably provide timely notification that Plaintiff's and Class members' PII had been compromised by an unauthorized third party; and for intentionally and unconscionably deceiving Plaintiff and Class members concerning the status, safety, location, access, and protection of their PII.

**PARTIES**

***Plaintiff Richard Delano Cornell***

11.     Plaintiff Richard Delano Cornell ("Plaintiff") is a resident and citizen of Illinois, residing in Chicago, Illinois. Plaintiff Cornell received a data breach letter from Defendant that was dated June 24, 2022.

4

### *Defendant Michigan Avenue Immediate Care*

12.     Defendant Michigan Avenue Immediate Care, S.C. is an urgent care clinic organized under the laws of the State of Illinois, with its principal place of business at 180 North Michigan Avenue, Suite 1605, Chicago, IL 60601.

### JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

14.     This Court has personal jurisdiction over Defendant because Defendant is authorized to and regularly conducts business in Illinois, and is headquartered in Chicago, Illinois.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District.

### FACTUAL ALLEGATIONS

**A.     Michigan Avenue Immediate Care - Background**

16.     MAIC provides immediate care services, treatment for acute and non-urgent medical problems, broad diagnostic treatment including on-site x-ray services and laboratories, student health services, travel medicine, vaccine appointments, and other medical services at its

Chicago locations.[6] MAIC represents to its patients that "you, the patient, are the ultimate 'customer' . . ." and "[w]e will strive to provide, for you, a unique quality of medical care."[7]

17.     As part of their medical and business operations, MAIC collects, maintains, and stores the highly sensitive PII and medical information provided by its current and former patients, including but not limited to: full names, addresses, Social Security numbers, dates of birth, medical and treatment information, health insurance information, driver's license numbers, and contact information.

18.     On information and belief, at the time of the Data Breach, MAIC failed to implement necessary data security safeguards, which resulted in unauthorized third parties accessing the PII of approximately 144,104 current and former patients.[8]

19.     Current and former patients of MAIC, such as Plaintiff and Class members, allowed their PII to be made available to MAIC with the reasonable expectation that MAIC would comply with its obligation to keep their sensitive and personal information, including their PII, confidential and secure from illegal and unauthorized access, and that MAIC would provide them with prompt and accurate notice of any unauthorized access to their PII.

20.     Unfortunately for Plaintiff and Class members, MAIC failed to carry out its duty to safeguard sensitive PII and provide adequate data security, thus failing to protect Plaintiff and Class members from the exfiltration of their PII during the Data Breach.

---

[6] *About Us*, Michigan Avenue Immediate Care,
https://www.michiganavenueprimarycare.com/immediate-about-us (last accessed July 20, 2022).
[7] *Id.*
[8] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. Department of Health and Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed July 20, 2022).

**B.      The Data Breach**

21.      MAIC disclosed in a Notice sent on or about June 30, 2022, to Plaintiff and other affected individuals that it was affected by a cyber-security incident in which "an unauthorized third party gained access to [MAIC's] network and obtained files from certain MAIC computer systems." *See* Notice of Data Breach, attached hereto as **Exhibit A**. Further, MAIC acknowledges that the unauthorized actor(s) was able to exfiltrate Plaintiff's and Class members' PII, Social Security numbers, and medical information.

22.      However, MAIC failed to disclose to Plaintiff and other victims of the Data Breach when the "unauthorized third party" first gained access to MAIC's systems and how long the unauthorized actor had access to Plaintiff's and Class members' information. Instead, MAIC admitted to the Office of the Maine Attorney General that the unauthorized actor(s) had unfettered access to MAIC's computer systems, and Plaintiff's and other MAIC patients' PII, Social Security numbers, and other medical information, for almost **six months**—from November 11, 2021 until May 4, 2022.[9]

23.      MAIC asserts that upon discovering the Data Breach, it "quickly secured [its] network and contained the incident." *See* Exhibit A. However, MAIC was not able to secure its computer systems until May 4, 2022, three days after it discovered the Data Breach.[10] MAIC failed to disclose to Plaintiff and Class members that MAIC was unable to quickly remove the hacker's access to MAIC's computer systems. *See* Exhibit A.

24.      Despite discovering the Data Breach on May 1, 2022, MAIC failed to determine that, during the six months that the unauthorized actor had unfettered access to MAIC's computer

---

[9] *See Data Breach Notification*, Office of Maine Atty. General,
https://apps.web.maine.gov/online/aeviewer/ME/40/49e2514b-9732-47b6-9416-1b454fcd2bbe.shtml (last accessed June 22, 2022).
[10] *See id.*

systems, the unauthorized third party obtained and exfiltrated the PII, Social Security numbers, and medical records of MAIC's patients, such as Plaintiff and Class members, until May 12, 2022.

25.     Moreover, despite acquiring knowledge of the unauthorized access to its computer systems on May 1, 2022, and confirming that the unauthorized actor access and exfiltrated patient PII, Social Security numbers, and medical records, MAIC delayed sending individualized notice to affected patients until on or after June 30, 2022. *See* Exhibit A.

26.     During the time that the unauthorized individuals had unrestricted access to MAIC's network, they were able to access and acquire personal, sensitive, and protected PII and medical information belonging to over 144,000 current and former MAIC patients.

**C.      MAIC's Many Failures Both Prior to and Following the Breach**

27.     MAIC could have prevented this Data Breach by properly encrypting or otherwise protecting their equipment and network files containing PII.

28.     To be sure, collecting, maintaining, and protecting PII is vital to virtually every aspect of MAIC's operations as a medical treatment institute.

29.     Despite such importance, MAIC failed to detect that its own data system was compromised until on or around May 1, 2022.[11]

30.     Moreover, when MAIC finally acknowledged that it had experienced a breach, it failed to fully inform affected individuals of the length of time that the unauthorized actors had access to their PII, or even the full extent of the PII that was accessed during the Data Breach.

31.     MAIC's failure to properly safeguard Plaintiff's and Class members' PII and medical information allowed the unauthorized actors to access this highly sensitive PII and medical

---

[11] *Immediate Care Facility in Chicago Hacked in December. Do Patients Know? (UPDATE1)*, DateBreaches.net, https://www.databreaches.net/immediate-care-facility-in-chicago-hacked-in-december-do-patients-know/ (last accessed July 20, 2022).

information, and MAIC's failure to timely notify Plaintiff and other victims of the Data Breach that their PII had been misappropriated precluded them from taking meaningful steps to safeguard their identities prior to the dissemination of their PII.

32. The Data Breach also highlights the inadequacies inherent in MAIC's network monitoring procedures. If MAIC had properly monitored its cyber security systems, it would have prevented the Data Breach, discovered the Data Breach sooner, and/or have prevented the hackers from exfiltrating PII and medical information. In an article published on *DataBreaches.net*, the alleged malevolent actors stated in an interview that MAIC's network protections were extremely poor, noting "[t]hey have [a] very weak computer security. Hacking their systems took only 1.5 hours."[12]

33. MAIC's delayed response only further exacerbated the consequences of the Data Breach brought on by its systemic IT failures.

34. First, MAIC failed to timely secure its computer systems to protect its current and former patients' PII and medical information. MAIC allowed the unauthorized actors to continue to have access to MAIC's systems for three days after MAIC discovered the Data Breach.

35. Second, MAIC failed to timely notify affected individuals, including Plaintiff and Class members, that their highly-sensitive PII had been accessed by unauthorized third parties.

36. Third, MAIC has made no effort to protect Plaintiff and the Class from the long-term consequences of MAIC's acts and omissions. Although the Notice offered victims a complimentary one-year membership to Experian IdentityWorks Credit 3B credit monitoring services, Plaintiff's and Class members' PII, including their Social Security numbers, cannot be

---

[12] *Id.*

changed and will remain at risk long beyond one year. As a result, Plaintiff and the Class will remain at a heightened and unreasonable risk of identity theft for the remainder of their lives.

37. In short, MAIC's myriad failures, including the failure to timely detect the Data Breach and to notify Plaintiff and Class members with reasonable timeliness that their personal and medical information had been exfiltrated due to MAIC's security failures, allowed unauthorized individuals to access and misappropriate Plaintiff's and Class members' PII for months before MAIC finally granted victims the opportunity to take proactive steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach.

**D.      Data Breaches Pose Significant Threats**

38. Data breaches have become a constant threat that, without adequate safeguards, can expose personal data to malicious actors. It is well known that PII, including Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

39. In 2018, the Identity Theft Resource Center and CyberScout Annual End-of-Year Data Breach Report revealed a 126% increase in exposed data.[13] Between January and July 2019, more than 31.6 million healthcare records were exposed in data security incidents—more than double the total amount of healthcare data breaches for all of 2018.[14]

40. In fact, Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, estimates that the annual number of data breaches occurring in the United States increased by approximately 692% between 2005

---

[13] *2018 End of Year Data Breach Report*, Identity Theft Resource Center, available at https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf (last accessed July 20, 2022).

[14] Steve Adler, *First Half of 2019 Sees 31.6 Million Healthcare Records Breached*, HIPAA Journal (Aug. 2, 2019), available at: https://www.hipaajournal.com/first-half-of-2019-sees-31-million-healthcare-records-breached.

and 2018, a year during which over 446.5 million personal records were exposed due to data breach incidents.[15] Conditions have only worsened since: Statista estimates that "[i]n 2019, the number of data breaches in the United States amounted to 1,473 with over 164.68 million sensitive records exposed[,]" and that "[i]n the first half of 2020, there were 540 reported data breaches."[16]

41.    Data breaches are a constant threat because of the price that PII are sold for on the dark web. According to Experian, medical records sell on the dark web for prices that are hundreds or thousands of times the price of basic personal or financial information.[17] For the individual, identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

42.    Individuals are particularly concerned with protecting the privacy of their financial account information and social security numbers. Neal O'Farrell, a security and identity theft expert for Credit Sesame, calls a Social Security number "your secret sauce," that is "as good as your DNA to hackers." There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiff and Class members cannot obtain new numbers unless they become a victim of Social Security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."

---

[15] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2020*, Statista, https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-unitedstates-by-number-of-breaches-and-records-exposed (last accessed July 20, 2022).
[16] *Id.*
[17] *See* Brian Stack*, Here's How Much Your Personal Information is Selling for on the Dark Web*, Experian (Dec. 6, 2017), available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

43. Data breaches involving medical and health information, like the one here at issue, amplify those risks considerably because of the access it provides to criminals.

44. When the PII includes medical information, the identity theft could extend to sending the victim fake medical bills or obtaining medical services using the victim's insurance or financial information, which can result in unknown, unpaid bills being sent to collections or using the victim's health insurance.[18]

45. Moreover, unlike victims of just credit card identity theft, victims of medical records data breaches cannot simply "reverse" fraudulent transactions.[19] As such, victims of data breaches in which hackers misappropriate highly sensitive patient PII often are unable to recover the losses they suffer as a result thereof, and must expend additional time and money to mitigate and protect themselves from further attempts at identity theft. One study found that the majority of medical identity theft victims had to pay an average of $13,500 to resolve issues stemming from the data breach, and only 10% of victims achieve a completely satisfactorily resolution.[20] Almost one-third of medical identity theft victims lost their health insurance as a result of the identity theft.[21]

46. As explained by Kunal Rupani, director of product management at Accellion, a private cloud solutions company, in the context of a different medical data breach:

> Unlike credit card numbers and other financial data, healthcare information doesn't have an expiration date. As a result, a patient's records can sell on the black market

---

[18] Medical Identity Theft, Federal Trade Commission (Jan. 2011), available at: https://www.bulkorder.ftc.gov/system/files/publications/bus75-medical-identity-theft-faq-health-care-health-plan.pdf.

[19] *See The $300 Billion Attack: The Revenue Risk and Human Impact of Healthcare Provider Cyber Security Inaction*, Accenture, available at: https://www.accenture.com/_acnmedia/PDF-54/Accenture-Health-Cybersecurity-300-Billion-at-Risk.pdf (last visited Feb. 12, 2021).

[20] *See Fifth Annual Study on Medical Identity Theft*, Ponemon Institute LLC (Feb. 2015), at pp.2, 7, available at: https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65.

[21] *Id.*

for upwards of fifty times the amount of their credit card number, making hospitals and other healthcare organizations extremely lucrative targets for cybercriminals.[22]

47.     SecureWorks, a division of Dell Inc., echoed that sentiment, noting that "[i]t's a well known truism within much of the healthcare data security community that an individual healthcare record is worth more on the black market ($50, on average) than a U.S.-based credit card and personal identity with social security number combined."[23] The reason is that thieves "[c]an use a healthcare record to submit false medical claims (and thus obtain free medical care), purchase prescription medication, or resell the record on the black market."[24]

48.     Similarly, the FBI Cyber Division in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[25]

49.     In light of the dozens of high-profile health and medical information data breaches that have been reported in recent years, entities like Defendant charged with maintaining and securing patient PII know the importance of protecting that information from unauthorized disclosure. Indeed, on information and belief, Defendant was aware of highly publicized security breaches where PII and protected health information was accessed by unauthorized

---

[22] Jeff Goldman, 21st Century Oncology Notifies 2.2 Million Patients of Data Breach (Mar. 11, 2016), http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last visited Feb. 11, 2021).
[23] What's the Market Value of a Healthcare Record, Dell SecureWorks (Dec. 13, 2012), https://www.secureworks.com/blog/general-market-value-of-a-healthcare-record (last visited Feb. 11, 2021).
[24] Id.
[25] Federal Bureau of Investigation, FBI Cyber Division Private Industry Notification (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf (last visited Feb. 11, 2021).

cybercriminals, including breaches of computer systems involving: UnityPoint Health, Lifetime Healthcare, Inc., Community Health Systems, Kalispell Regional Healthcare, Anthem, Premera Blue Cross, and many others.[26]

50.     In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendant on notice of their obligation to safeguard customer and patient information.

51.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

52.     Further, consumers' PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[27] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market

---

[26] *See e.g., Healthcare Data Breach Statistics*, HIPAA Journal, available at: https://www.hipaajournal.com/healthcare-data-breach-statistics (last accessed Feb. 15, 2021).
[27] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, available at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed July 20, 2022).

value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[28]

53.     Social Security numbers are among the most dangerous kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[29]

54.     Furthermore, trying to change or cancel a stolen Social Security number is no minor task. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

---

[28] *Dark Web Price Index 2021*, Zachary Ignoffo, March 8, 2021, available at https://www.privacyaffairs.com/dark-web-price-index-2021/ (last accessed July 20, 2022).
[29] Social Security Administration, *Identity Theft and Your Social Security Number*, available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 20, 2022).

55.     Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[30]

56.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[31]

57.     Given the nature of MAIC's Data Breach, as well as the length of the time MAIC's networks were breached and the long delay in notification to the Class, it is foreseeable that the compromised PII has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class members' PII can easily obtain Plaintiff's and Class members' tax returns or open fraudulent credit card accounts in Class members' names. In fact, according to the interview conducted by *DataBreach.net* with the malevolent actors allegedly responsible for the MAIC Data Breach, the malevolent actors have already started selling the illegally obtained PII.[32]

58.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data

---

[30] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), available at http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed July 20, 2022).
[31] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), available at http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed July 20, 2022).
[32] *Immediate Care Facility in Chicago Hacked in December. Do Patients Know? (UPDATE1)*, DateBreaches.net, https://www.databreaches.net/immediate-care-facility-in-chicago-hacked-in-december-do-patients-know/ (last accessed July 20, 2022).

breach, because credit card victims can cancel or close credit and debit card accounts.[33] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

59.     To date, MAIC has offered its consumers *only one year* of identity monitoring services. The offered services are inadequate to protect Plaintiff and the Class from the threats they face for years to come, particularly in light of the PII at issue here.

60.     Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgment of the risks posed by data breaches, and its own acknowledgment of its duties to keep PII private and secure, MAIC failed to take appropriate steps to protect the PII of Plaintiff and the Class from misappropriation. As a result, the injuries to Plaintiff and the Class were directly and proximately caused by MAIC's failure to implement or maintain adequate data security measures for its current and former patients.

**E.      MAIC Had a Duty and Obligation to Protect PII**

61.     MAIC has an obligation, both statutory and self-imposed, to keep confidential and protect from unauthorized access and/or disclosure Plaintiff's and Class members' PII. MAIC's obligations are derived from: 1) government regulations and state laws, including HIPAA and FTC rules and regulations; 2) industry standards; and 3) promises and representations regarding the handling of sensitive PII and medical records. Plaintiff and Class members provided, and MAIC obtained, their PII on the understanding that their PII would be protected and safeguarded from unauthorized access or disclosure.

---

[33] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes, Mar 25, 2020, available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed July 20, 2022).

62.     HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of consumer and patient PII, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII, regularly review access to data bases containing protected information, and procedures and systems to detect, contain, and correct any unauthorized access to protected information. *See* 45 CFR § 164.302, *et seq.*

63.     Additionally, HIPAA requires Covered Entities and Business Associates to provide notification to every affected individual following the impermissible use or disclosures of any protected health information. The individual notice must be provided to affected individuals without unreasonable delay and no later than 60 days following discovery of the breach. Further, for a breach involving more than 500 individuals, entities are required to provide notice in prominent media outlets. *See* 45 CFR § 164.400, *et seq.*

64.     Defendant publicly admits that it is subject to HIPAA,[34] and represents to and promises consumers that it will use protected health information "in compliance with [HIPAA] and will be limited to the relevant requirements of the law."[35] As such, Defendant represents and promises patients and customers that it will comply with HIPAA requirements concerning the protection of PII and protected health information and prompt and adequate notification of data breaches.

---

[34]  *See HIPAA Notice of Privacy Practices*, Michigan Avenue Immediate Care, https://sa1s3.patientpop.com/assets/docs/370629.pdf.
[35] *Id.*

65.     Additionally, the Federal Trade Commission's ("FTC") Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

66.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[36] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[37]

67.     The FTC has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-marking.[38]

68.     In 2016, the FTC updated its publication, P*rotecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[39] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and

---

[36] 17 C.F.R. § 248.201 (2013).
[37] *Id.*
[38] *Start With Security*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf. (last accessed July 20, 2022).
[39] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (Jan. 23, 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business. (last accessed July 20, 2022).

implement policies to correct security problems.[40] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[41] MAIC clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, and the amount of data exfiltrated.

69.     Here, at all relevant times, MAIC was fully aware of its obligation to protect the PII and protected health information of its current and former patients, including Plaintiff and the Class, and MAIC is a sophisticated and technologically savvy medical treatment center that relies extensively on technology systems and networks to maintain its medical practice, including transmitting its patients' PII, protected health information, and medical information in order to operate its business.[42]

70.     MAIC had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the PII and medical information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between MAIC and Plaintiff and Class members. MAIC alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiff's and Class members' PII.

71.     MAIC's failure to follow the FTC guidelines and its subsequent failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data constitutes unfair acts or practices prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 14 U.S.C. § 45.

---

[40] *Id.*
[41] *Id.*
[42] *See About Us*, Michigan Avenue Immediate Care,
https://www.michiganavenueprimarycare.com/immediate-about-us (last accessed July 20, 2022).

72.     Further, MAIC had a duty to promptly notify Plaintiff and the Class that their PII was accessed by unauthorized persons.

**F.      MAIC Violated HIPAA, FTC and Industry Standard Data Protection Protocols**

73.     HIPAA obligates Covered Entities and Business Associates to adopt administrative, physical, and technology safeguards to ensure the confidentially, integrity, and security of consumer and patient PII.

74.     The FTC rules, regulations, and guidelines obligate businesses to protect PII, from unauthorized access or disclosure by unauthorized persons.

75.     At all relevant times, Defendant was fully aware of its obligation to protect the customers and patient PII because it is a sophisticated business entity that is in the business of maintaining and transmitting PII, including personal health and medical records.

76.     Defendant was also aware of the significant consequences of its failure to protect PII for the hundreds of thousands of patients who provided their PII and medical information to Defendant, and knew that this data, if hacked, would injure consumers, including Plaintiff and Class members.

77.     Unfortunately, MAIC failed to comply with HIPAA, FTC rules, regulations and guidelines, and industry standards concerning the protection and security of PII. As evidenced by the duration, scope, and nature of the Data Breach, among its many deficient practices, MAIC failed in, *inter alia*, the following respects:

a.      Developing and employing adequate intrusion detection systems;

b.      Engaging in regular reviews of audit logs and authentication records;

c.      Developing and maintaining adequate data security systems to reduce the risk of data breaches and cyberattacks;

d. Ensuring the confidentiality and integrity of current and former patients' PII, including protected health and information and records that Defendant receives and maintains;

e. Protecting against any reasonably anticipated threats or hazards to the security or integrity of its current and former patients' PII;

f. Implementing policies and procedures to prevent, detect, contain, and correct security violations;

g. Developing adequate policies and procedures to regularly review records of system activity, such as audit logs, access reports, and security incident tracking reports;

h. Implementing technical policies, procedures and safeguards for electronically stored information concerning PII that permit access for only those persons or programs that have specifically been granted access; and

i. Other similar measures to protect the security and confidentiality of its current and former patients' PII.

78. Had MAIC implemented the above-described data security protocols, policies, and/or procedures, the consequences of the Data Breach could have been avoided or greatly reduced. MAIC could have prevented or detected the Data Breach prior to the hackers accessing MAIC's systems and extracting sensitive and personal information; the amount and/or types of PII accessed by the hackers could have been avoided or greatly reduced; and current and former patients of MAIC would have been notified sooner, allowing them to promptly take protective and mitigating actions.

## G. MAIC's Data Security Practices are Inadequate and Inconsistent with its Self-Imposed Data Security Obligations

79. MAIC purports to care about data security and safeguarding patients' PII, and represents that it will keep secure and confidential the PII belonging to its current and former patients.

80. Plaintiff's and Class members' PII and medical information was provided to MAIC in reliance on its promises and self-imposed obligations to keep PII and medical information

confidential, and to secure the PII and medical information from unauthorized access by malevolent actors. It failed to do so.

81. The length of the Data Breach also demonstrates that MAIC failed to safeguard PII by, *inter alia*: maintaining an adequate data security environment to reduce the risk of a data breach; periodically auditing its security systems to discover intrusions like the Data Breach; and retaining outside vendors to periodically test its network, servers, systems and workstations.

82. Had MAIC undertaken the actions that federal and state law require, the Data Breach could have been prevented or the consequences of the Data Breach significantly reduced, as MAIC would have detected the Data Breach prior to the hackers extracting data from MAIC's networks, and MAIC's current and former patients would have been notified of the Data Breach sooner, allowing them to take necessary protective or mitigating measures much earlier.

83. Indeed, following the Data Breach, MAIC effectively conceded that its security practices were inadequate and ineffective. In the Notice it sent to Plaintiff and others, MAIC acknowledged that the Data Breach required it to "implement appropriate safeguards to help protect patient information." *See* Exhibit A.

## H. Plaintiff and the Class Suffered Harm Resulting from the Data Breach

84. Like any data hack, the Data Breach presents major problems for all affected. According to Jonathan Bowers, a fraud and data specialist at fraud prevention provider Trustev, "Give a fraudster your comprehensive personal information, they can steal your identity and take out lines of credit that destroy your finances for years to come."[43]

---

[43] Roger Cheng, *Data Breach Hits Roughly 15M T-Mobile Customers, Applicants*, CNET (Oct. 1, 2015), available at: http://www.cnet.com/news/data-breach-snags-data-from-15m-t-mobile-customers/. (last accessed July 20, 2022).

85.    The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[44]

86.    The ramifications of MAIC's failure to properly secure PII, including Plaintiff's and Class members' PII, are severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission to commit fraud or other crimes.

87.    According to data security experts, one out of every four data breach notification recipients becomes a victim of identity fraud.

88.    Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

89.    Accordingly, MAIC's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[45]  Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[46]  Javelin Strategy & Research, a leading

---

[44]    *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last accessed July 20, 2022).

[45]    *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (February 23, 2012), available at http://www.iii.org/insuranceindustryblog/?p=267 (last accessed July 20, 2022).

[46]    Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), available at  http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php  (last accessed July 20, 2022).

provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[47] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class members' PII will do so at a later date or re-sell it.

90.     In response to the Data Breach, MAIC offered to provide certain individuals whose PII was exposed in the Data Breach with one year of credit monitoring. However, one year of complimentary credit monitoring is a time frame much shorter than what is necessary to protect against the lifelong risk of harm imposed on Plaintiff and Class members by MAIC's failures.

91.     Moreover, the credit monitoring offered by MAIC is inadequate to protect them from the injuries resulting from the unauthorized access and exfiltration of their sensitive PII.

92.     Here, due to the Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

      a.    Theft of PII, including protected health information;

      b.    Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the PII stolen during the Data Breach;

      c.    Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

      d.    Costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts,

---

[47] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH- IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, available at https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf) (last accessed July 20, 2022).

including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite MAIC's delay in disseminating notice in accordance with state law;

e.   The imminent and impending injury resulting from potential fraud and identity theft posed because their PII is exposed for theft and sale on the dark web; and

f.   The loss of Plaintiff's and Class members' privacy.

93.   Plaintiff and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their PII and protected health information being accessed by cybercriminals, risks that will not abate within a mere one year: the unauthorized access of Plaintiff's and Class members' PII, especially their Social Security numbers, puts Plaintiff and the Class at risk of identity theft indefinitely, and well beyond the limited period of credit monitoring that MAIC offered victims of the Breach. The one year of credit monitoring that MAIC offered to certain victims of the Data Breach is inadequate to mitigate the aforementioned injuries Plaintiff and Class members have suffered and will continue to suffer as a result of the Data Breach.

94.   As a direct and proximate result of MAIC's acts and omissions in failing to protect and secure PII and medical information, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and have incurred and will incur actual damages in an attempt to prevent identity theft.

95.   Plaintiff retains an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both himself/herself and similarly situated individuals whose PII and medical information was accessed in the Data Breach.

96.     MAIC is aware of the ongoing harm that the Data Breach has and will continue to impose on MAIC's current and former patients, as the notices that it posted and sent to Plaintiff and Class members regarding the Data Breach advise the victims to "take steps to help protect yourself against identify theft or fraud." *See* Exhibit A.

**I.     Plaintiff Cornell's Experience**

97.     On or about June 24, 2022, Plaintiff Cornell received a notice from Defendant that his PII had been improperly accessed and/or obtained by third parties. This notice indicated that Plaintiff's PII, inclusive of his name, address, telephone number, date of birth, Social Security number, driver's license number, treatment information and/or health information, was compromised in the Data Breach.

98.     As a result of the Data Breach, Plaintiff Cornell has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; and researching credit monitoring and identity theft protection services. Plaintiff has spent several hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and/or recreation.

99.     As a result of the Data Breach, Plaintiff has suffered anxiety as a result of the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud.  Plaintiff is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

100.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a

form of property that Defendant obtained from Plaintiff; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

101.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## CLASS ALLEGATIONS

102.    Plaintiff brings this action on behalf of himself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose PII was accessed in the Data Breach.

Excluded from the Class are Defendant, their executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

103.    In the alternative, Plaintiff brings this action on behalf of himself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a subclass of:

> All persons who are residents of the State of Illinois whose PII was accessed in the Data Breach (the "Illinois Subclass").

Excluded from the Illinois Subclass are Defendant, its executives and officers, and the Judge(s) assigned to this case.

104.    Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of MAIC and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis

28

alleges, that approximately 144,104 individuals comprise the Class and were affected by the Data Breach. The members of the Class will be identifiable through information and records in MAIC's possession, custody, and control.

105. <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. Whether MAIC's data security and retention policies were unreasonable;

b. Whether MAIC failed to protect the confidential and highly sensitive information with which it was entrusted;

c. Whether MAIC owed a duty to Plaintiff and Class members to safeguard their PII;

d. Whether MAIC breached any legal duties in connection with the Data Breach;

e. Whether MAIC's conduct was intentional, reckless, willful or negligent;

f. Whether an implied contract was created concerning the security of Plaintiff's and Class members' PII;

g. Whether MAIC breached that implied contract by failing to protect and keep secure Plaintiff's and Class members' PII and/or failing to timely and adequately notify Plaintiff and Class members of the Data Breach;

h. Whether Plaintiff and Class members suffered damages as a result of MAIC's conduct; and

i. Whether Plaintiff and the Class are entitled to monetary damages, injunctive relief and/or other remedies and, if so, the nature of any such relief.

106. <u>Typicality</u>: All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all members of the Class had their PII compromised in the Data Breach. Plaintiff and the members of the Class sustained damages as a result of MAIC's uniform wrongful conduct.

107. <u>Adequacy</u>: Plaintiff is an adequate representative because his interests do not materially or irreconcilably conflict with the interests of the Class he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor his counsel have any interests that are antagonistic to the interests of other members of the Class.

108. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by MAIC's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, MAIC's records and databases.

109. MAIC has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

## **CAUSES OF ACTION**

### **COUNT I — Negligence**
**(By Plaintiff on behalf of the Class, or, in the alternative, the Illinois Subclass)**

110. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

111.     This count is brought on behalf of all Class members.

112.     MAIC owed a duty to Plaintiff and the Class to use and exercise reasonable and due care in obtaining, retaining, and securing the PII that MAIC collected.

113.     MAIC owed a duty to Plaintiff and the Class to provide security, consistent with industry standards and requirements, and to ensure that its cyber networks and systems, and the personnel responsible for them, adequately protected the PII that MAIC collected.

114.     MAIC owed a duty to Plaintiff and the Class to implement processes to quickly detect a data breach, to timely act on warnings about data breaches, and to inform the victims of a data breach as soon as possible after it is discovered.

115.     MAIC owed a duty of care to Plaintiff and the Class because they were a foreseeable and probable victim of any inadequate data security practices.

116.     MAIC solicited, gathered, and stored the PII belonging to Plaintiff and the Class.

117.     MAIC knew or should have known it inadequately safeguarded this information.

118.     MAIC knew that a breach of its systems would inflict millions of dollars of damages upon Plaintiff and Class members, and MAIC was therefore charged with a duty to adequately protect this critically sensitive information.

119.     MAIC had a special relationship with Plaintiff and Class members. Plaintiff's and Class members' highly sensitive PII and medical information was entrusted to MAIC on the understanding that adequate security precautions would be taken to protect the PII and medical information. Moreover, only MAIC had the ability to protect its systems and the PII stored on them from attack.

120.     MAIC's own conduct also created a foreseeable risk of harm to Plaintiff, Class members, and their PII. MAIC's misconduct included failing to: (1) secure its systems, servers and

31

networks, despite knowing their vulnerabilities, (2) comply with industry standard security practices, (3) implement adequate system and event monitoring, and (4) implement the safeguards, policies, and procedures necessary to prevent this type of data breach.

121.     MAIC breached its duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate cyber networks and data security practices to safeguard the PII belonging to Plaintiff and the Class.

122.     MAIC breached its duties to Plaintiff and the Class by creating a foreseeable risk of harm through the misconduct previously described.

123.     MAIC breached the duties it owed to Plaintiff and Class members by failing to implement proper technical systems or security practices that could have prevented the unauthorized access of PII.

124.     The law further imposes an affirmative duty on MAIC to timely disclose the unauthorized access and theft of the PII belonging to Plaintiff and the Class so that Plaintiff and the Class can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their PII.

125.     MAIC breached the duties it owed to Plaintiff and the Class by failing to timely and accurately disclose to Plaintiff and Class members that their PII had been improperly acquired or accessed.

126.     MAIC breached its duty to timely notify Plaintiff and Class members of the Data Breach by failing to provide direct notice to Plaintiff and the Class concerning the Data Breach until on or about June 30, 2022.

127.     As a direct and proximate result of MAIC's conduct, Plaintiff and the Class have suffered a drastically increased risk of identity theft, relative to both the time period before the

breach, as well as to the risk born by the general public, as well as other damages, including but not limited to time and expenses incurred in mitigating the effects of the Data Breach.

128.    As a direct and proximate result of MAIC's negligent conduct, Plaintiff and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT II — Negligence *Per Se***
**(By Plaintiff on behalf of the Class, or, in the alternative, the Illinois Subclass)**

129.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

130.    This count is brought on behalf of all Class members.

131.    HIPAA obligates Covered Entities and Business Associates to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information" and "must reasonably safeguard protected health information." 45 CFR § 164.530(c).

132.    In the event of a data breach, HIPAA obligates Covered Entities and Business Associates to notify affected individuals, prominent media outlets, and the Secretary of the Department of Health and Human Services of the data breach without unreasonable delay and in no event later than 60 days after discovery of the data breach. 45 CFR § 164.400, *et seq.*

133.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as MAIC, of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of MAIC's duty.

134.    The Illinois Personal Information Protection Act ("PIPA") requires that entities in possession of PII belonging to Illinois residents that was or may have been accessed by unauthorized persons disclose the data breach without unreasonable delay. *See* 815 ILCS 530/10.

135. The Illinois Consumer Fraud and Deceptive Trade Practices Act requires that entities refrain from "[u]nfair methods of competition and unfair or deceptive acts or practices . . ." *See* 815 ILCS 505/2.

136. In addition to the FTC rules and regulations, the PIPA, and the Illinois Consumer Fraud and Deceptive Trade Practices Act, other states and jurisdictions where victims of the Data Breach are located require that MAIC protect PII from unauthorized access and disclosure, and timely notify the victim of a data breach.

137. MAIC violated HIPAA, PIPA, the Illinois Consumer Fraud and Deceptive Trade Practices Act, and FTC rules and regulations obligating companies to use reasonable measures to protect PII by failing to comply with applicable industry standards; and by unduly delaying reasonable notice of the actual breach. MAIC's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, the foreseeable consequences of a Data Breach and the exposure of Plaintiff's and Class members' sensitive PII.

138. MAIC's violations of HIPAA, PIPA, the Illinois Consumer Fraud and Deceptive Trade Practices Act, Section 5 of the FTC Act and other applicable statutes, rules, and regulations constitutes negligence *per se*.

139. Plaintiff and the Class are within the category of persons HIPAA, PIPA, the Illinois Consumer Fraud and Deceptive Trade Practices Act, and the FTC Act were intended to protect.

140. The harm that occurred as a result of the Data Breach described herein is the type of harm HIPAA, PIPA, the Illinois Consumer Fraud and Deceptive Trade Practices Act, and FTC Act were intended to guard against.

141. As a direct and proximate result of MAIC's negligence *per se*, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are

subject to the continued risk of exposure of their PII in MAIC's possession, and are entitled to damages in an amount to be proven at trial.

## COUNT III –- Breach of Implied Contract
### (By Plaintiff on behalf of the Class, or, in the alternative, the Illinois Subclass)

142.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

143.    This count is brought on behalf of all Class members.

144.    Plaintiff and the Class provided MAIC with their PII and medical information.

145.    By providing their PII and medical information, and upon MAIC's acceptance of such information, Plaintiff and the Class, on one hand, and MAIC, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contract entered into between the parties.

146.    The implied contracts between MAIC and Plaintiff and Class members obligated MAIC to take reasonable steps to secure, protect, safeguard, and keep confidential Plaintiff's and Class members' PII and medical information. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above. MAIC expressly adopted and assented to these terms in its public statements, representations and promises as described above.

147.    The implied contracts for data security also obligated MAIC to provide Plaintiff and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their PII and medical information.

148.    MAIC breached the implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the PII and medical information belonging to Plaintiff and Class members; allowing unauthorized persons to access Plaintiff's and Class members' PII; and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiff and Class members, as alleged above.

35

149.     As a direct and proximate result of MAIC's breaches of the implied contracts, Plaintiff and the Class have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of their PII and medical information in MAIC's possession, and are entitled to damages in an amount to be proven at trial.

<u>**COUNT IV –- Bailment**</u>
**(By Plaintiff on behalf of the Class, or, in the alternative, the Illinois Subclass)**

150.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

151.     This count is brought on behalf of all Class members.

152.     Plaintiff's and Class members' PII was provided to MAIC.

153.     In delivering their PII and, Plaintiff and Class members intended and understood that their PII would be adequately safeguarded and protected.

154.     MAIC accepted Plaintiff's and Class members' PII.

155.     By accepting possession of Plaintiff's and Class members' PII, MAIC understood that Plaintiff and the Class expected their PII to be adequately safeguarded and protected. Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties.

156.     During the bailment (or deposit), MAIC owed a duty to Plaintiff and the Class to exercise reasonable care, diligence, and prudence in protecting their PII.

157.     MAIC breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and Class members' PII, resulting in the unlawful and unauthorized access to and misuse of Plaintiff's and Class members' PII.

158.     MAIC further breached its duty to safeguard Plaintiff's and Class members' PII by failing to timely notify them that their PII had been compromised as a result of the Data Breach.

159.     MAIC failed to return, purge, or delete the PII belonging to Plaintiff and Class members at the conclusion of the bailment (or deposit) and within the time limits allowed by law.

160.     As a direct and proximate result of MAIC's breach of its duties, Plaintiff and the

Class suffered consequential damages that were reasonably foreseeable to MAIC, including but

not limited to the damages set forth herein.

161.     As a direct and proximate result of MAIC's breach of its duty, Plaintiff's and Class

members PII that was entrusted to MAIC during the bailment (or deposit) was damaged and its

value diminished.

## COUNT V — Violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act
### 815 ILCS 505/1, *et seq.*
### (By Plaintiff on behalf of the Class, or, in the alternative, the Illinois Subclass)

162.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

163.     This count is brought on behalf of the Illinois Subclass.

164.     The Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815

ILCS 505/1, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or

practices . . ." 815 ILCS 505/2.

165.     MAIC's deceptive and unfair acts, omissions, and conduct include, but are not

limited to:

    a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class members' PII, which was a direct and proximate cause of the Data Breach;

    b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the industry, which were direct and proximate causes of the Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII, including but not limited to duties imposed by the FTC Act, which were direct and proximate causes of the Data Breach;

    d.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class members' PII, including by implementing and maintaining reasonable security measures;

e.      Misrepresenting that it would comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and Class members' PII;

f.      Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class members' PII;

g.      Omitting, suppressing, and concealing the material fact that it did not comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and Class members' PII; and

h.      Failing to promptly and adequately notify Plaintiff and the Class that their PII was accessed by unauthorized persons in the Data Breach.

166.    MAIC had exclusive knowledge of material information regarding its deficient security policies and practices, and regarding the security of Plaintiff's and Class members' PII. This exclusive knowledge includes, but is not limited to, information that MAIC received through internal and other non-public audits and reviews that concluded that MAIC's security policies were substandard and deficient, and that Plaintiff's and Class members' PII and other MAIC data was vulnerable.

167.    MAIC had exclusive knowledge about the extent of the Data Breach, including during the days, weeks, and months following the Data Breach.

168.    MAIC also had exclusive knowledge about the length of time that it maintained individual's PII after they stopped using MAIC's services.

169.    MAIC failed to disclose, and actively concealed, the material information it had regarding MAIC's deficient security policies and practices, and regarding the security of the sensitive PII and medical information. For example, even though MAIC has long known, through internal audits and otherwise, that its security policies and practices were substandard and deficient, and that Plaintiff's and Class members' PII was vulnerable as a result, MAIC failed to disclose this information to, and actively concealed this information from, Plaintiff, Class members and the public. MAIC also did not disclose, and actively concealed, information regarding the

extensive length of time that it maintains former patients' PII and other records. Likewise, during the days and weeks following the Data Breach, MAIC failed to disclose, and actively concealed, information that it had regarding the extent and nature of the Data Breach.

170.    MAIC had a duty to disclose the material information that it had because, *inter alia*, it had exclusive knowledge of the information, it actively concealed the information, and because MAIC was in a fiduciary position by virtue of the fact that MAIC collected and maintained Plaintiff's and Class members' PII and medical information.

171.    MAIC's representations and omissions were material because they were likely to deceive reasonable individuals about the adequacy of MAIC's data security and its ability to protect the confidentiality of current and former patients' PII.

172.    Had MAIC disclosed to Plaintiff and the Class that its data systems were not secure and, thus, vulnerable to attack, MAIC would have been unable to continue in business without adopting reasonable data security measures and complying with the law. Instead, MAIC received, maintained, and compiled Plaintiff's and Class members' PII without advising that MAIC's data security practices were insufficient to maintain the safety and confidentiality of their PII.

173.    Accordingly, Plaintiff and Class members acted reasonably in relying on MAIC's misrepresentations and omissions, the truth of which they could not have discovered.

174.    MAIC's practices were also contrary to legislatively declared and public policies that seek to protect data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected in laws, such as the Illinois Consumer Fraud and Deceptive Trade Practices Act, the Illinois Personal Information Protection Act, and the FTC Act.

175.    The injuries suffered by Plaintiff and the Class greatly outweigh any potential countervailing benefit to consumers or to competition, and are not injuries that Plaintiff and the Class should have reasonably avoided.

176.    The damages, ascertainable losses and injuries, including to their money or property, suffered by Plaintiff and the Class as a direct result of MAIC's deceptive acts and practices as set forth herein include, without limitation:

    a.    unauthorized charges on their debit and credit card accounts;

    b.    theft of their PII;

    c.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

    d.    loss of use of and access to their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse effects on their credit scores and adverse credit notations;

    e.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate and mitigate the actual and future consequences of the Data Breach, including without limitation finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

    f.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

    g.    damages to and diminution in value of their personal information entrusted to MAIC as their patients, and with the understanding that MAIC would safeguard their data against theft and not allow access and misuse of their data by others; and

    h.    the continued risk to their PII, which remains in the possession of MAIC and which is subject to further breaches so long as MAIC fails to undertake appropriate and adequate measures to protect data in its possession.

177.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring MAIC from disclosing their PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

**COUNT VI — Violation of State Data Breach Statutes**
**(By Plaintiff on behalf of the Class)**

178.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

179.    This count is brought on behalf of all Class members.

180.    MAIC is a corporation that owns, maintains, and records PII, and computerized data including PII, about its current and former patients, including Plaintiff and Class members.

181.    MAIC is in possession of PII belonging to Plaintiff and Class members and is responsible for reasonably safeguarding that PII consistent with the requirements of the applicable laws pertaining hereto.

182.    MAIC failed to safeguard, maintain, and dispose of, as required, the PII within its possession, custody, or control as discussed herein, which it was required to do by all applicable State laws.

183.    MAIC, knowing and/or reasonably believing that Plaintiff's and Class members' PII was acquired by unauthorized persons during the Data Breach, failed to provide reasonable and timely notice of the Data Breach to Plaintiff and Class members as required by following data breach statutes.

184.    MAIC's failure to provide timely and accurate notice of the Data Breach violated the following state data breach statutes:

        a.        Alaska Stat. Ann. § 45.48.010(a), *et seq.*;

        b.        Ark. Code Ann. § 4-110-105(a), *et seq.*;

c.      Cal. Civ. Code § 1798.80, *et seq.*;

d.      Colo. Rev. Stat. Ann § 6-1-716(2), *et seq.*;

e.      Conn. Gen. Stat. Ann. § 36a-701b(b), *et seq.*;

f.      Del. Code Ann. Tit. 6 § 12B-102(a), *et seq.*;

g.      D.C. Code § 28-3852(a), *et seq.*;

h.      Fla. Stat. Ann. § 501.171(4), *et seq.*;

i.      Ga. Code Ann. § 10-1-912(a), *et seq.*;

j.      Haw. Rev. Stat. § 487N-2(a), *et seq.*;

k.      Idaho Code Ann. § 28-51-105(1), *et seq.*;

l.      Illinois Statute 815 ILCS 530/1, *et seq.*;

m.      Iowa Code Ann. § 715C.2(1), *et seq.*;

n.      Kan. Stat. Ann. § 50-7a02(a), *et seq.*;

o.      Ky. Rev. Stat. Ann. § 365.732(2), *et seq.*;

p.      La. Rev. Stat. Ann. § 51:3074(A), *et seq.*;

q.      Md. Code Ann., Commercial Law § 14-3504(b), *et seq.*;

r.      Mass. Gen. Laws Ann. Ch. 93H § 3(a), *et seq.*;

s.      Mich. Comp. Laws Ann. § 445.72(1), *et seq.*;

t.      Minn. Stat. Ann. § 325E.61(1)(a), *et seq.*;

u.      Mont. Code Ann. § 30-14-1704(1), *et seq.*;

v.      Neb. Rev. Stat. Ann. § 87-803(1), *et seq.*;

w.      Nev. Rev. Stat. Ann. § 603A.220(1), *et seq.*;

x.      N.H. Rev. Stat. Ann. § 359-C:20(1)(a), *et seq.*;

y.      N.J. Stat. Ann. § 56:8-163(a), *et seq.*;

z.      N.C. Gen. Stat. Ann. § 75-65(a), *et seq.*;

aa.     N.D. Cent. Code Ann. § 51-30-02, *et seq.*;

bb.     Okla. Stat. Ann. Tit. 24 § 163(A), *et seq.*;

cc.     Or. Rev. Stat. Ann. § 646A.604(1), *et seq.*;

dd.     R.I. Gen. Laws Ann. § 11-49.3-4(a)(1), *et seq.*;

ee.     S.C. Code Ann. § 39-1-90(A), *et seq.*;

ff.     Tenn. Code Ann. § 47-18-2107(b), *et seq.*;

gg.     Tex. Bus. & Com. Code Ann. § 521.053(b), *et seq.*;

hh.     Utah Code Ann. § 13-44-202(1), *et seq.*;

ii.     Va. Code. Ann. § 18.2-186.6(B), *et seq.*;

jj.     Wash. Rev. Code Ann. § 19.255.010(1), *et seq.*;

kk.     Wis. Stat. Ann. § 134.98(2), *et seq.*; and

ll.     Wyo. Stat. Ann. § 40-12-502(a), *et seq.*

185.    As a result of MAIC's failure to reasonably safeguard Plaintiff's and Class members' PII, and the failure to provide reasonable and timely notice of the Data Breach to Plaintiff and Class members, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in MAIC's possession, and are entitled to damages in an amount to be proven at trial.

### COUNT VII – Violation of State Consumer Protection Statutes
### (On behalf of Plaintiff, the Class, and the Subclass)

186.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

187.    This count is brought on behalf of all Class members.

188.    MAIC is a "person" as defined in the relevant state consumer statutes.

189.     MAIC engaged in the conduct alleged herein that was intended to result, and which did result, in the trade and commerce with Plaintiff and Class members. MAIC is engaged in, and its acts and omissions affect, trade and commerce. Further, MAIC's conduct implicates consumer protection concerns generally.

190.     MAIC's acts, practices and omissions were done in the course of MAIC's business of marketing, facilitating, offering for sale, and selling goods and services throughout the United States.

191.     MAIC's unlawful, unfair, deceptive, fraudulent and/or unconscionable acts and practices include:

a.     Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class members' PII, which was a direct and proximate cause of the Data Breach;

b.     Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the industry, which was a direct and proximate cause of the Data Breach;

c.     Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class members' PII, including but not limited to duties imposed by the FTC Act and similar state laws, rules, and regulations, which was a direct and proximate cause of the Data Breach;

d.     Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class members' PII, including by implementing and maintaining reasonable security measures;

e.     Misrepresenting that it would comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and the Class members' PII;

f.     Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class members' PII;

g.     Omitting, suppressing, and concealing the material fact that it did not comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiff's and Class members' PII; and

h.     Failing to promptly and adequately notify Plaintiff and Class members that their PII was accessed by unauthorized persons in the Data Breach.

192.   By engaging in such conduct and omissions of material facts, MAIC has violated state consumer laws prohibiting representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," representing that "goods and services are of a particular standard, quality or grade, if they are of another", and/or "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding"; and state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices.

193.   MAIC's representations and omissions were material because they were likely to deceive reasonable persons about the adequacy of MAIC's data security and ability to protect the confidentiality of PII.

194.   MAIC intentionally, knowingly, and maliciously misled Plaintiff and Class members and induced them to rely on its misrepresentations and omissions.

195.   Had MAIC disclosed that its data systems were not secure and, thus, vulnerable to attack, it would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, MAIC received, maintained, and compiled Plaintiff's and Class members' PII without advising that MAIC's data security practices were insufficient to maintain the safety and confidentiality of their PII. Accordingly, Plaintiff and the Class members acted reasonably in relying on MAIC's misrepresentations and omissions, the truth of which they could not have discovered.

196.   Past breaches within the industry put MAIC on notice that its security and privacy protections were inadequate.

197.     MAIC's practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected in laws like the PIPA, the Illinois Consumer Fraud and Deceptive Trade Practices Act, and the FTC Act.

198.     The harm these practices caused to Plaintiff and the Class members outweighed their utility, if any.

199.     The damages, ascertainable losses and injuries, including to their money or property, suffered by Plaintiff and Class members as a direct result of MAIC's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices as set forth herein include, without limitation:

   a.     unauthorized charges on their debit and credit card accounts;

   b.     theft of their PII;

   c.     costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

   d.     loss of use of and access to their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse effects on their credit scores and adverse credit notations;

   e.     costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate and mitigate the actual and future consequences of the Data Breach, including without limitation finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

   f.     the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

   g.     damages to and diminution in value of their personal and medical information entrusted to MAIC and with the understanding that MAIC

would safeguard their data against theft and not allow access and misuse of their data by others; and

h.    the continued risk to their PII, which remains in the possession of MAIC and which is subject to further breaches so long as MAIC fails to undertake appropriate and adequate measures to protect data in its possession.

200.    MAIC's conduct described herein, including without limitation, MAIC's failure to maintain adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII, MAIC's failure to disclose the material fact that it did not have adequate computer systems and safeguards to adequately protect Plaintiff's and Class members' PII, MAIC's failure to provide timely and accurate notice to of the material fact of the Data Breach, and MAIC's continued acceptance of Plaintiff's and Class members' PII constitute unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices in violation of the following state consumer statutes:

a.    The Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5(5), (7) and (27), *et seq.*;

b.    The Arizona Consumer Fraud Act, A.R.S. § 44-1522;

c.    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2), *et seq.*;

d.    The California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and the California Unfair Competition Law, Cal. Bus. and Prof. Code, § 17200, *et seq.*;

e.    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), *et seq.*;

f.    The Delaware Deceptive Trade Practices Act, Del. Code Ann. Title 6, § 2532(5) and (7), *et seq.*, and the Delaware Consumer Fraud Act, Del. Code Ann. Title 6 § 2513, *et seq.*;

g.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), *et seq.*;

h.    The Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-393(a) and (b)(2), (5) and (7), *et seq.*;

i.      The Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A-3(a)(5), (7) and (12), *et seq.*; and the Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. § 480-2(a), *et seq.*;

j.      The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), *et seq.*; and Idaho Code § 48-603C, *et seq.*;

k.      The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2, *et seq.*;

l.      The Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and (b)(1) and (2), *et seq.*;

m.      The Iowa Consumer Fraud Act, I.C.A. §§ 714H.3 and 714H.5, *et seq.*;

n.      The Kansas Consumer Protection Act, Kan. Stat. §§ 50-626(a) and (b)(1)(A)(D) and (b)(3), *et seq.*;

o.      The Kentucky Consumer Protection Act, K.R.S. § 367.170(1) and (2), *et seq.*;

p.      The Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1405(A), *et seq.*;

q.      The Maine Uniform Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1212(1)(E) and (G), *et seq.*, and the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207, *et seq.*;

r.      The Maryland Consumer Protection Act, Md. Code Commercial Law, § 13-301(1) and (2)(i), and (iv) and (9)(i), *et seq.*;

s.      The Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § 2(a), *et seq.*;

t.      The Michigan Consumer Protection Act, M.C.P.L.A. § 445.903(1)(c)(e),(s) and (cc), *et seq.*;

u.      The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), et seq., the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd. 3(a);

v.      The Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-5(1), (2)(e) and (g), *et seq.*;

w.      The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), *et seq.*;

x. The Montana Unfair Trade Practices and Consumer Protection Act, MCA §§ 30-14-103, *et seq.*;

y. The Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302(a)(5) and (7), *et seq.*;

z. The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7), *et seq.*;

aa. The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2(v) and (vii), *et seq.*;

bb. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, *et seq.*;

cc. The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7) and (14) and 57-12-3, *et seq.*;

dd. New York Business Law, N.Y. Gen. Bus. Law § 349(a);

ee. The North Carolina Unfair Trade Practices Act N.C.G.S.A. § 75-1.1(a), *et seq.*;

ff. The North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02, *et seq.*;

gg. The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A) and (B)(1) and (2), *et seq.*;

hh. The Oklahoma Consumer Protection Act, 15 Okl. Stat. Ann. § 753(5), (7) and (20), *et seq.*; and the Oklahoma Deceptive Trade Practices Act, 78 Okl. Stat. Ann. § 53(A)(5) and (7), *et seq.*;

ii. The Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.608(1)(e)(g) and (u), *et seq.*;

jj. The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v)(vii) and (xxi), and 201-3, *et seq.*;

kk. The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1(6)(v), (vii), (xii), (xiii) and (xiv), *et seq.*;

ll. The South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20(a), *et seq.*;

mm. The South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1), *et seq.*;

nn.     The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104(a) and (b)(5) and (7);

oo.     The Texas Deceptive Trade Practices- Consumer Protection Act, V.T.C.A., Bus. & C. § 17.46(a), (b)(5) and (7), *et seq.*;

pp.     The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1) and (2)(a) and (b);

qq.     The Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a), *et seq.*;

rr.     The Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A)(5)(6) and (14), *et seq.*;

ss.     The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, *et seq.*;

tt.     The West Virginia Consumer Credit and Protection Act, W.V.A. Code § 46A-6-104, *et seq.*;

uu.     The Wisconsin Deceptive Trade Practices Act, W.S.A. § 100.20(1), *et seq.*; and

vv.     The Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i), (iii) and (xv), *et seq.*

201.    Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring MAIC from disclosing their PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

## <u>COUNT VIII – Violation of the Illinois Personal Information Protection Act</u>
### (By Plaintiff on behalf of the Illinois Subclass)

202.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

203.    This count is brought on behalf of the Illinois Subclass.

204.    The Illinois Personal Information Protection Act ("PIPA"), 815 ILCS 530/1, *et seq.*, obligates "data collectors" that own, license, maintain or store records that contain personal information of Illinois residents to "implement and maintain reasonable security measures to

50

protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 ILCS 530/45.

205.    Additionally, the PIPA creates a duty for data collectors to notify Illinois residents of any data breach "immediately following discovery" of the data breach. 815 ILCS 530/10(b).

206.    Defendant is a "data collector" as defined by PIPA.

207.    Defendant failed to implement and maintain reasonable security measures to safeguard, protect and keep confidential Plaintiff's and Illinois Subclass members' PII from unauthorized access or disclosure, as alleged herein.

208.    Defendant, knowing and/or reasonably believing that Plaintiff's and Illinois Subclass members' PII was acquired or accessed by unauthorized persons during the Data Breach, failed to provide prompt, immediate, and reasonable notice of the Data Breach to Plaintiff and the Illinois Subclass as required by PIPA.

209.    Defendant's failure to implement and maintain reasonable security measures to protect consumer and patient PII, and/or Defendant's failure to provide timely and accurate notice of the Data Breach violated the PIPA.

210.    As a result of Defendant's failure to reasonably safeguard the PII belonging to Plaintiff and the Illinois Subclass, and Defendant's failure to provide reasonable and timely notice of the Data Breach to Plaintiff and the Illinois Subclass, Plaintiff and the Illinois Subclass have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

## COUNT IX – Violation of the Illinois Consumer Fraud and Deceptive Practices Act
### Vis-à-Vis Violations of the Illinois Personal Information Protection Act
#### (On behalf of Plaintiff and the Illinois Subclass)

211.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

212.    This count is brought on behalf of all Illinois Subclass members.

213.    A violation of the PIPA constitutes an unlawful practices in violation of ICFA. 815 ILCS 530/20.

214.    As described above, Defendant failed to implement and maintain reasonable security measures to safeguard, protect and keep confidential Plaintiff's and Illinois Subclass members' PII from unauthorized access or disclosure, as alleged herein.

215.    Defendant, knowing and/or reasonably believing that Plaintiff's and Illinois Subclass members' PII was acquired or accessed by unauthorized persons during the Data Breach, failed to provide prompt, immediate, and reasonable notice of the Data Breach to Plaintiff and the Illinois Subclass as required by PIPA.

216.    Defendant's failure to implement and maintain reasonable security measures to protect current and former employees' PII, and/or Defendant's failure to provide timely and accurate notice of the Data Breach violated the PIPA.

217.    By violating PIPA, Defendant's conduct constitutes an unlawful practice in violation of the ICFA.

218.    Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendant from disclosing their PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

## COUNT X — Intrusion Upon Seclusion
### (By Plaintiff on behalf of the Class, or, in the alternative, the Illinois Subclass)

219.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

220.    This count is brought on behalf of all Class members.

221.    Plaintiff bring this claim on behalf of persons who reside in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Texas, Utah, Vermont, Washington, and West Virginia; and any other state that recognizes a claim for intrusion upon seclusion under the facts and circumstances alleged above (the "Intrusion Upon Seclusion States").

222.    Plaintiff and Class members had a reasonable expectation of privacy in the PII that MAIC possessed and/or continues to possess.

223.    By failing to keep Plaintiff's and Class members' PII safe, and by misusing and/or disclosing their PII to unauthorized parties for unauthorized use, MAIC invaded Plaintiff's and Class members' privacy by:

      a.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

      b.    Publicizing private facts about Plaintiff and Class members, which is highly offensive to a reasonable person.

224.    MAIC knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's position would consider MAIC's actions highly offensive.

225.    MAIC invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

226.    As a proximate result of such misuse and disclosures, Plaintiff's and Class members' reasonable expectation of privacy in their PII was unduly frustrated and thwarted. MAIC's conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

227.    In failing to protect Plaintiff's and Class members' PII, and in misusing and/or disclosing their PII, MAIC has acted with malice and oppression and in conscious disregard of Plaintiff's and the Class members rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its millions of patients. Plaintiff, therefore, seeks an award of damages, including punitive damages, on behalf of Plaintiff and the Class.

**COUNT XI — Unjust Enrichment**
**(By Plaintiff on behalf of the Class, or, in the alternative, the Illinois Subclass)**

228.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

229.    This count is brought on behalf of all Class members.

230.    Plaintiff and the Class have an interest, both equitable and legal, in their PII and medical information that was collected and maintained by MAIC.

231.    MAIC was benefitted by the conferral upon it of Plaintiff's and Class members' PII and by its ability to retain and use that information. MAIC understood that it was in fact so benefitted.

232.    MAIC also understood and appreciated that Plaintiff's and Class members' PII and medical information was private and confidential and its value depended upon MAIC maintaining the privacy and confidentiality of that information.

233.    But for MAIC's willingness and commitment to maintain its privacy and confidentiality, Plaintiff and Class members would not have provide or authorized their PII to be

provided to MAIC, and MAIC would have been deprived of the competitive and economic advantages it enjoyed by falsely claiming that its data-security safeguards met reasonable standards. These competitive and economic advantages include, without limitation, wrongfully gaining patients, gaining the reputational advantages conferred upon it by Plaintiff and Class members, collecting excessive advertising and sales revenues as described herein, monetary savings resulting from failure to reasonably upgrade and maintain data technology infrastructures, staffing, and expertise raising investment capital as described herein, and realizing excessive profits.

234.    As a result of MAIC's wrongful conduct as alleged herein (including, among other things, its deception of Plaintiff, the Class, and the public relating to the nature and scope of the data breach; its failure to employ adequate data security measures; its continued maintenance and use of the PII belonging to Plaintiff and Class members without having adequate data security measures; and its other conduct facilitating the theft of that PII) MAIC has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class.

235.    MAIC's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and Class members' sensitive PII, while at the same time failing to maintain that information secure from intrusion.

236.    Under the common law doctrine of unjust enrichment, it is inequitable for MAIC to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and the Class in an unfair and unconscionable manner. MAIC's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

237.     The benefit conferred upon, received, and enjoyed by MAIC was not conferred officiously or gratuitously, and it would be inequitable and unjust for MAIC to retain the benefit.

238.     MAIC is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on MAIC as a result of its wrongful conduct, including specifically the value to MAIC of the PII and medical information that was accessed and exfiltrated in the Data Breach and the profits MAIC receives from the use and sale of that information.

### COUNT XII — Declaratory Judgment
**(By Plaintiff on behalf of the Class, or, in the alternative, the Illinois Subclass)**

239.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

240.     This count is brought on behalf of all Class members.

241.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described herein.

242.     An actual controversy has arisen in the wake of the Data Breach regarding MAIC's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class members' PII, and whether MAIC is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their PII. Plaintiff alleges that MAIC's data security measures remain inadequate.

243.     Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

244.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that MAIC continues to owe a legal duty to secure Plaintiff's and Class

members' PII, to timely notify them of any data breach, and to establish and implement data security measures that are adequate to secure PII.

245. The Court also should issue corresponding prospective injunctive relief requiring MAIC to employ adequate security protocols consistent with law and industry standards to protect Plaintiff's and Class members' PII.

246. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy. The threat of another breach of the PII in MAIC's possession, custody, and control is real, immediate, and substantial. If another breach of MAIC's network, systems, servers, or workstations occurs, Plaintiff and the Class will not have an adequate remedy at law, because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

247. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to MAIC if an injunction is issued. Among other things, if another massive data breach occurs at MAIC, Plaintiff and the Class will likely be subjected to substantial identify theft and other damage. On the other hand, the cost to MAIC of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and MAIC has a pre-existing legal obligation to employ such measures.

248. Issuance of the requested injunction will serve the public interest by preventing another data breach at MAIC, thus eliminating additional injuries to Plaintiff and the thousands of Class members whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully requests that the Court enter judgment in their favor and against MAIC, as follows:

A. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B. That Plaintiff be granted the declaratory relief sought herein;

C. That the Court grant permanent injunctive relief to prohibit MAIC from continuing to engage in the unlawful acts, omissions, and practices described herein;

D. That the Court award Plaintiff and the Class members compensatory, consequential, and general damages in an amount to be determined at trial;

E. That the Court award Plaintiff and the Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

F. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G. That the Court award pre- and post-judgment interest at the maximum legal rate;

H. That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I. That the Court grant all other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the putative Class, demand a trial by jury on all issues so triable.

Date: July 26, 2022                   Respectfully Submitted,

                                      */s/ Daniel O. Herrera*

                                      Daniel O. Herrera
                                      Nickolas J. Hagman
                                      Olivia Lawless
                                      **CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
                                      135 S. LaSalle, Suite 3210
                                      Chicago, Illinois 60603
                                      Telephone: (312) 782-4880
                                      Facsimile: (312) 782-4485
                                      dherrera@caffertyclobes.com
                                      nhagman@caffertyclobes.com
                                      olawless@caffertyclobes.com

                                      Gary M. Klinger
                                      **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                      227 W. Monroe Street, Suite 2100
                                      Chicago, IL 60606
                                      T: 866.252.0878
                                      gklinger@milberg.com

                                      David K. Lietz
                                      **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                      5335 Wisconsin Ave. NW, Suite 440
                                      Washington, D.C. 20015
                                      T: 866.252.0878
                                      dlietz@milberg.com

                                      *Attorneys for Plaintiff and the Proposed Class*

# EXHIBIT A



<<Date>> (Format: Month Day, Year)

<<first_name>> <<middle_name>> <<last_name>> <<suffix>>
<<address_1>>
<<address_2>>
<<city>>, <<state_province>> <<postal_code>>
<<country>>

Dear <<first_name>> <<middle_name>> <<last_name>> <<suffix>>,

Michigan Avenue Immediate Care ("MAIC") values and respects the privacy of the information you share with us. We are committed to safeguarding your information, which is why we are writing to advise you of an incident that appears to have involved some of your personal information. This letter provides information about the incident and what we are doing to help you protect yourself from the potential misuse of your information.

**What Happened?** On May 1, 2022, we learned that an unauthorized third party gained access to our network and obtained files from certain MAIC computer systems. Upon learning of the incident, we quickly secured our network and contained the incident. We also retained a leading forensic security firm to investigate and confirm the security of our computer systems.

**What Information Was Involved?** On or around May 12, 2022, we determined that the files believed to have been obtained by the unauthorized third party contained personal information. The information varied by individual, but may have included your name, address, telephone number, date of birth, Social Security number, driver's license number, treatment information and/or health insurance information.

**What We Are Doing.** We continue to implement appropriate safeguards to help protect patient information. We are also notifying you so that you can be aware of the incident and take steps to help protect yourself against identity theft or fraud, if you feel that is appropriate. Although we are not aware of any identity theft or fraudulent use of your information in connection to this incident, we are offering you a complimentary one-year membership of Experian IdentityWorks Credit 3B. This product helps detect possible misuse of your personal information, whether from this incident or any other incident, and provides you with identity protection services focused on immediate identification and resolution of identity theft. IdentityWorks Credit 3B is completely free to you and enrolling in this program will not hurt your credit score. **For more information on identity theft prevention and IdentityWorks Credit 3B, including instructions on how to activate your complimentary, one-year membership, please see the additional information attached to this letter.**

**What You Can Do.** You can find more information on steps to help protect yourself against identity theft or fraud in the enclosed *Additional Important Information* sheet.

**For More Information.** If you have any questions about the information contained in this letter, or we can be of further assistance, please call (855) 482-1566, Monday through Friday from 8:00 a.m. to 5:30 p.m. Central Time, excluding some major U.S. holidays.

We stand ready to assist as stated above. Please know that we take your privacy very seriously and we have taken important steps to safeguard your information.

Sincerely,

Michigan Avenue Immediate Care

ELN-14672

**Activate IdentityWorks Credit 3B**

To help protect your identity, we are offering a **complimentary** one-year membership of Experian IdentityWorks^SM Credit 3B.  This product helps detect possible misuse of your personal information and provides you with superior identity protection support focused on immediate identification and resolution of identity theft.

**Activate IdentityWorks Credit 3B Now in Three Easy Steps**

1. ENROLL by: <<b2b_text_6 (date)>> (Your code will not work after this date.)
2. VISIT the **Experian IdentityWorks website** to enroll at: **https://www.experianidworks.com/3bcredit**
3. PROVIDE the **Activation Code**: <<Activation Code s_n>>

If you have questions about the product, need assistance with identity restoration or would like an alternative to enrolling in Experian IdentityWorks online, please contact Experian's customer care team at (833) 541-1594.  Be prepared to provide engagement number <<b2b_text_1 (engagement number)>> as proof of eligibility for the identity restoration services by Experian.

**ADDITIONAL DETAILS REGARDING YOUR 12-MONTH EXPERIAN IDENTITYWORKS CREDIT 3B MEMBERSHIP:**

A credit card is **not** required for enrollment in Experian IdentityWorks Credit 3B.

You can contact Experian **immediately without needing to enroll in the product** regarding any fraud issues. Identity Restoration specialists are available to help you address credit and non-credit related fraud.

Once you enroll in Experian IdentityWorks, you will have access to the following additional features:

- **Experian credit report at signup:** See what information is associated with your credit file.  Daily credit reports are available for online members only.*
- **Credit Monitoring:** Actively monitors Experian, Equifax and Transunion files for indicators of fraud.
- **Experian IdentityWorks ExtendCARE**^TM:  You receive the same high-level of Identity Restoration support even after your Experian IdentityWorks membership has expired.
- **$1 Million Identity Theft Insurance\*\*:**  Provides coverage for certain costs and unauthorized electronic fund transfers.

**Activate your membership today at https://www.experianidworks.com/3bcredit
or call (833) 541-1594 to register with the activation code above.**

**What you can do to protect your information:** There are additional actions you can consider taking to reduce the chances of identity theft or fraud on your account(s).  Please refer to www.ExperianIDWorks.com/restoration for this information.  If you have any questions about IdentityWorks, need help understanding something on your credit report or suspect that an item on your credit report may be fraudulent, please contact Experian's customer care team at (833) 541-1594.


* Offline members will be eligible to call for additional reports quarterly after enrolling.

** The Identity Theft Insurance is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdiction.

**Additional Important Information**

As a precautionary measure, we recommend that you remain vigilant to protect against potential fraud and/or identity theft by, among other things, reviewing your account statements and monitoring credit reports closely. If you detect any suspicious activity on an account, you should promptly notify the financial institution or company with which the account is maintained. You should also promptly report any fraudulent activity or any suspected incidents of identity theft to proper law enforcement authorities, including the police and your state's attorney general, as well as the Federal Trade Commission ("FTC").

You may wish to review the tips provided by the FTC on fraud alerts, security/credit freezes and steps you can take to avoid identity theft. For more information and to contact the FTC, please visit www.ftc.gov/idtheft or call 1-877-ID-THEFT (1-877-438-4338). You may also contact the FTC at Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580.

**Credit Reports:** You may obtain a free copy of your credit report once every 12 months from each of the three national credit reporting agencies by visiting www.annualcreditreport.com, by calling toll-free 1-877-322-8228, or by completing an Annual Credit Report Request Form and mailing it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348. You can print a copy of the request form at https://www.annualcreditreport.com/manualRequestForm.action.

Alternatively, you may elect to purchase a copy of your credit report by contacting one of the three national credit reporting agencies. Contact information for the three national credit reporting agencies for the purpose of requesting a copy of your credit report or for general inquiries is as follows:

| | | |
|---|---|---|
| Equifax | Experian | TransUnion |
| 1-866-349-5191 | 1-888-397-3742 | 1-800-888-4213 |
| www.equifax.com | www.experian.com | www.transunion.com |
| P.O. Box 740241 | P.O. Box 2002 | P.O. Box 2000 |
| Atlanta, GA 30374 | Allen, TX 75013 | Chester, PA 19016 |

**Fraud Alerts:** You may want to consider placing a fraud alert on your credit report. A fraud alert is free and will stay on your credit report for one (1) year. The alert informs creditors of possible fraudulent activity within your report and requests that the creditor contact you prior to establishing any new accounts in your name. To place a fraud alert on your credit report, contact any of the three national credit reporting agencies using the contact information listed above. Additional information is available at www. annualcreditreport.com.

**Credit and Security Freezes:** You may have the right to place a credit freeze, also known as a security freeze, on your credit file, so that no new credit can be opened in your name without the use of a PIN number that is issued to you when you initiate the freeze. A credit freeze can be placed without any charge and is designed to prevent potential credit grantors from accessing your credit report without your consent. If you place a credit freeze, potential creditors and other third parties will not be able to get access to your credit report unless you temporarily lift the freeze. Therefore, using a credit freeze may delay your ability to obtain credit. Unlike a fraud alert, you must separately place a credit freeze on your credit file at each credit reporting company. Since the instructions for how to establish a credit freeze differ from state to state, please contact the three major credit reporting companies as specified below to find out more information:

| | | |
|---|---|---|
| Equifax Security Freeze | Experian Security Freeze | TransUnion Security Freeze |
| 1-888-298-0045 | 1-888-397-3742 | 1-888-909-8872 |
| www.equifax.com | www.experian.com | www.transunion.com |
| P.O. Box 105788 | P.O. Box 9554 | P.O. Box 160 |
| Atlanta, GA 30348 | Allen, TX 75013 | Woodlyn, PA 19094 |

This notification was not delayed by law enforcement.

Individuals interacting with credit reporting agencies have rights under the Fair Credit Reporting Act. We encourage you to review your rights under the Fair Credit Reporting Act by visiting https://files.consumerfinance.gov/f/documents/bcfp_consumer-rights-summary_2018-09.pdf, or by requesting information in writing from the Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.

**Iowa Residents**: Iowa residents can contact the Office of the Attorney General to obtain information about steps to take to avoid identity theft from the Iowa Attorney General's office at: Office of the Attorney General of Iowa, Hoover State Office Building, 1305 E. Walnut Street, Des Moines IA 50319, 515-281-5164.

**Maryland Residents**: Maryland residents can contact the Office of the Attorney General to obtain information about steps you can take to avoid identity theft from the Maryland Attorney General's office at: Office of the Attorney General, 200 St. Paul Place, Baltimore, MD 21202, (888) 743-0023, http://www.marylandattorneygeneral.gov/.

**New York State Residents:** New York residents can obtain information about preventing identity theft from the New York Attorney General's Office at: Office of the Attorney General for the State of New York, Bureau of Consumer Frauds & Protection, The Capitol, Albany, New York 12224-0341; https://ag.ny.gov/consumer-frauds/identity-theft; (800) 771-7755.

**North Carolina Residents**:  North Carolina residents can obtain information about preventing identity theft from the North Carolina Attorney General's Office at: North Carolina Attorney General's Office, Consumer Protection Division, 9001 Mail Service Center, Raleigh, NC 27699-9001; 877-5-NO-SCAM (Toll-free within North Carolina); 919-716-6000; www.ncdoj.gov.

**Rhode Island Residents**:  We believe that this incident affected 75 Rhode Island residents.  Rhode Island residents can contact the Office of the Attorney General at: Rhode Island Office of the Attorney General, 150 South Main Street, Providence, RI  02903, (401) 274-4400, www.riag.ri.gov. You have the right to obtain any police report filed in regard to this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it.

**Vermont Residents:** If you do not have internet access but would like to learn more about how to place a security freeze on your credit report, contact the Vermont Attorney General's Office at 802-656-3183 (800-649-2424 toll free in Vermont only).